1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9      MICHAEL J. CRUMMER,                          No. C 08-3158 WHA (PR)

10                    Petitioner,                   **ORDER DENYING PETITION FOR**
                                                    **WRIT OF HABEAS CORPUS**
11            v.

12     ROBERT A. HOREL, Warden,

13                    Respondent.
                                            /
14

15                              **INTRODUCTION**

16            This is a habeas case filed pro se by a state prisoner pursuant to 28 U.S.C. 2254.

17     Respondent was ordered to show cause why the writ should not be granted based on the four

18     remaining claims in the petition.  Respondent has filed an answer and a memorandum of points

19     and authorities in support of it, petitioner has filed a traverse.  For the reasons set forth below,

20     the petition is **DENIED**.

21                               **STATEMENT**

22            Petitioner was tried and convicted with his co-defendant Maunice Sandefur by a jury of

23     felony assault with a deadly weapon (Cal. Pen. Code § 245(a)(1)) and second degree robbery

24     (Cal. Pen. Code §§ 211 and 212.5(c)).  The jury also found true allegations that petitioner

25     personally inflicted great bodily injury and used a deadly weapon (Cal. Pen. Code §§

26     12022.7(a) and 12022(b)(1)).  A second jury found that petitioner had suffered numerous prior

27     convictions.  Petitioner was sentenced under California's "Three Strikes" law to a term of

28     thirty-seven years to life in state prison.

United States District Court

For the Northern District of California

On November 19, 2007, the California Court of Appeal affirmed the judgment but decreased petitioner's sentence by one year, leaving him with a sentence of thirty-six years to life (Ex. C.4 at 36).[1]  The California Supreme Court denied petitioner's petition for review on March 12, 2008 (Ex. D.2).  Petitioner filed the instant federal habeas petition on July 1, 2008.

The following background facts describing the crime are taken from the opinion of the California Court of Appeal:

> Sandefur's sister, Pandora Lewis, had a laptop computer that she wanted to sell. Sandefur agreed to help her sell it and arranged for a mutual acquaintance named Juanita Murdoch to buy it. On April 22, 2003, Sandefur sold the laptop to Murdoch for an agreed price of $200. Murdoch paid $170 and told Sandefur to come to her home the next day to pick up the $30 balance.

> On the evening of April 23, 2003, Lewis went over to Murdoch's apartment. Murdoch's friends, Betty Davis-Warren (Davis) and Sadie Donelson, were visiting her. Lewis saw her laptop on the kitchen table and asked whether Sandefur had sold it to Murdoch. When Murdoch said she had, Lewis became angry and immediately called Sandefur. Approximately ten minutes later, Sandefur arrived at Murdoch's apartment. Davis, who was outside on the porch smoking a cigarette, followed Sandefur into the apartment. Donelson saw Sandefur arrive but then went to the mailboxes on the first floor of the building.

> Murdoch testified at trial that Sandefur came "barging through the door," and began arguing with Lewis about the money that Murdoch had paid for the computer. When Murdoch complained about some missing software, Sandefur began yelling at her. Murdoch testified that she left the room and Sandefur followed her. At some point, the two women began to fight. According to Murdoch, Sandefur threw the first punch but Murdoch temporarily gained the upper hand when she became "crazy" angry after Sandefur pulled off her hair extensions. Then, however, Sandefur pulled out a claw hammer, either from her pants leg or waist and hit Murdoch in the head with it, causing her to slip on a bedroom rug and fall to the floor.

> Davis testified that she watched the argument between Sandefur and Murdoch turn into a "full-fledged fight." Sandefur threw the first punch, and the fight moved down the hallway into a bedroom. Davis, who was "kind of in shock" when the fight began, ran to the bedroom when she heard Murdoch's screams and found her on the floor, face up with Sandefur "straddled across" with her leg over Murdoch, hitting her in the face with a hammer. Davis estimated that Sandefur hit Murdoch five or six times while Murdoch tried to fight back, protect her face and push Sandefur away. Davis tried to stop Sandefur and had just managed to grab hold of something, perhaps Sandefur's hand or the hammer, when a man came up behind her and grabbed her by her neck and told her to let go. He said that he "had it . . . would handle it. He would help." Davis felt that the man, who she identified at trial as Crummer, was much larger than her and was in a better position to help. So she let go and ran out of the room to look for help.

> Donelson testified that she returned to Murdoch's apartment when she heard screaming from the outside mailbox area of the complex. From the kitchen, Donelson saw Sandefur and Murdoch fighting in the bedroom. Sandefur hit Murdoch with her fist and

---

[1]The exhibits referenced herein are those lodged by respondent in support of his answer.

then pulled out a hammer and started hitting her in the head. At some point, Crummer walked into the apartment and Donelson asked him to help stop the fight. He walked toward the bedroom as if he was going to help. Instead, Crummer took the hammer and began to attack Murdoch. Donelson estimated that Crummer hit Murdoch with the hammer around six times while calling her a "bitch."

Murdoch testified that she recalled being hit by Crummer at least four times and that she lost consciousness at least twice during the attack. At one point, Murdoch grabbed Crummer's pant leg and hit him in the groin. Crummer hit her with the hammer on the top back of her head but she did not release her hold. Murdoch was dragged across the room until Crummer hit her with a picture that had been hanging on the wall, at which point she blacked out.

During the attack, Murdoch saw both Sandefur and Crummer take her property. Sandefur ripped jewelry from Murdoch's body and Crummer took jewelry and other items from the nightstand, jewelry box and dresser. Donelson also saw Sandefur pull gold necklaces from Murdoch's neck and testified that Crummer took things from the room including a plastic bag and some perfume. Davis testified that, when Sandefur, Crummer and Lewis left the apartment, one of them had the laptop and a chain was dangling from Sandefur's balled-up hand.

Police were summoned, took statements, arranged for medical assistance and dispatched information about Sandefur's car. At approximately 7:50 p.m., Concord police stopped Sandefur's car and appellants were detained. Davis and Donelson were summoned and identified appellants as the attackers.

From the back seat of Sandefur's car, police recovered a stainless steel construction hammer and a laptop computer, both smudged red. Numerous other items, later identified as having belonged to Murdoch, were found in the car and trunk, including a bottle of perfume, a set of keys, a camcorder, and some jewelry. A white terry cloth towel stained red had been hidden under the driver's seat. Two gold bracelets with blood on them were recovered from Sandefur's pants pocket.

At the trial in this case, Sandefur gave a very different version of the relevant events. According to Sandefur, Murdoch was a drug supplier and she, Lewis, Davis and Donelson were all customers. Murdoch agreed to pay $ 200 for the laptop computer and made an initial payment of $20 in cash and $50 in crack cocaine. The next day, Murdoch refused to pay Lewis the $130 balance. Through the phone, Sandefur heard Murdoch tell Lewis: "I'm not giving that bitch shit." Sandefur went to Murdoch's apartment angry that she had been called a derogatory name and that Murdoch had refused to pay the money she owed. Murdoch falsely accused Sandefur of having an affair with Murdoch's husband and then began to complain about the computer. She claimed the computer was missing a disc, demanded her money back and told Sandefur to take the computer. When Sandefur reached for it, Murdoch hit her hand with a hammer. Then, Davis and Donelson held Sandefur's arms while Murdoch took her jewelry.

According to Sandefur, she and Murdoch began to fight with their fists. After Murdoch slipped, Davis tried to hit Sandefur with the hammer. Sandefur ducked and the hammer struck Murdoch in the head. At some point, Sandefur noticed that Crummer, her boyfriend at the time, had entered the room and was struggling with Davis for the hammer. Sandefur then left the apartment with her sister and Crummer followed a few minutes later.

(Exh. C.4 at 2-8  (footnote omitted)).

**ANALYSIS**

**A.    STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations,  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  *Miller-El*, 537 U.S. at 340.  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v.  Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th

4

**United States District Court**
For the Northern District of California

Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Ibid.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

**B.    ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner's remaining claims are that: (1) the prosecution failed to turn over exculpatory evidence during discovery, specifically exonerating statements made by a witness; (2) the prosecutor committed misconduct by failing to disclose Lewis's location during the trial, impeding petitioner's ability to find her; (3) the trial court erred by granting protection under the Fifth Amendment to an exculpatory witness; and (4) trial counsel was ineffective in failing to compel the appearance or testimony of Pandora Lewis.

### 1.    <u>Withholding of Exculpatory Evidence</u>

Petitioner contends that the prosecution withheld from the defense an interview of Pandora Lewis by the police in which she stated that she did not see petitioner commit the crimes. Petitioner argues that this amounted to a violation of his right to due process *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Petitioner does not satisfy the *Brady* test. Lewis's statement that she did not see petitioner commit the crimes was arguably favorable to petitioner insofar as it was not damaging to him. It

was not "suppressed" by the prosecutor, however.  Defense counsel submitted a declaration in

connection petitioner's motion for a new trial, in which he raised this claim in the trial court,

stating that she had been provided with the transcripts and the tape of the police interrogation of

Lewis at the time she was appointed, long before the pretrial conference (Ex. A at 633).  A delay

in disclosure of *Brady* evidence even up until the pretrial conference does not violate *Brady*.  *See*

*Reiger v. Christensen*, 789 F.2d 1425, 1432 (9th Cir. 1986).  Based on counsel's declaration, the

trial court reasonably found that there was no failure on the part of the state to disclose

exculpatory evidence to petitioner (Ex. B at 1776).  Petitioner's right to due process was not

violated by any suppression of the evidence of Lewis's statement to the police.

In addition, petitioner has failed to show that prejudice ensued from any delay in

producing the evidence.  "[T]here is never a real '*Brady* violation' unless the nondisclosure was

so serious that there is a reasonable probability that the suppressed evidence would have

produced a different verdict."  *Stickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Here, there is no

reasonable probability that any failure by the state to disclose Lewis's statements earlier would

have produced a different verdict.  Petitioner would have had difficulty introducing Lewis's

statement to the police, as it was hearsay evidence.  Even if her statement could have been

admitted under a hearsay exception on the grounds that Lewis had not responded to a

prosecutor's subpoena and was therefore unavailable, or as a prior inconsistent statement if she

did testify, her statement that she did not see petitioner commit the crimes certainly did not rule

out petitioner's having done so.  In light of the substantial amount of other evidence, including

the eyewitness testimony of the victim, Davis and Donelson, and the blood and stolen property

found in the car with petitioner, Lewis's testimony that she only did not see petitioner commit

the crimes was very unlikely to have made any difference in the outcome of the case.

Because the record reflects that petitioner was given the relevant evidence prior to the

pretrial conference and that he was not prejudiced by any delay in the disclosure of such

evidence, the state courts' denial of this claim was neither contrary to nor an unreasonable

application of federal law.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

### 2. **Prosecutorial Misconduct**

Petitioner claims that the prosecutor committed misconduct by failing to disclose Lewis's location during the trial.  Petitioner tried to contact and subpoena Lewis on several occasions to no avail.  He claims that the prosecutor had updated contact information for Lewis, served Lewis with a subpoena at the new address, but never informed petitioner of her new address.  In addition, petitioner claims that neither he nor his attorney were informed that Lewis had appeared at the prosecutor's office during trial and had a conversation with an employee there.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*, the first issue is whether the prosecutor's conduct was improper; if so, the next question is whether such conduct infected the trial with unfairness.  *See Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).

The trial court found there was no failure on the part of the prosecutor to disclose Lewis's location and that there was no reason the defense could not have also subpoenaed Lewis as easily as the prosecutor (Ex. B at 1776).  This was a reasonable determination.  Lewis had not been responding to either prosecutor or defense subpoenas, but she arrived at the prosecutor's office one day during trial and left before the prosecutor returned to the office.  When the prosecutor returned to court afterwards, he discussed with the defense counsel Lewis's temporary appearance and provided counsel with Lewis's current address.  The address turned out to be same address that defense counsel already had for her, an address where defense counsel had tried unsuccessfully to reach Lewis (Ex. B at 1752).  As the prosecutor did not hide Lewis's current address from defense counsel or the fact that she appeared temporarily at the prosecutor's office during trial, there was no prosecutorial misconduct.  For the same reasons, petitioner's additional argument that the prosecutor interfered with his right to compel her to testify also fails.

In addition, defense counsel's inability to reach Lewis failure did not render the trial fundamentally unfair trial in violation of due process.  Lewis would not have cooperated with petitioner as a witness.  Petitioner and his co-defendant, who was Lewis's sister, tried to pin the crimes on each other.  Lewis told the police and prosecutor that she would not testify against her sister and she did not appear at trial in response to a subpoena by the prosecutor.  There is no evidence or indication that petitioner would have been any more successful than the prosecutor in getting her to testify, let alone that he would have succeeded in getting her to testify in his favor.  In addition, Lewis had credibility problems as there was evidence both of her drug use and that she had appeared to be under the influence of drugs during communications with the prosecutor.  Consequently, petitioner's inability to reach Lewis, even if that could somehow attributed to the prosecutor, did not hurt his defense or render the trial fundamentally unfair.  As a result, the state court's denial of this claim was neither an unreasonable application of or contrary to clearly established federal law.

### 3.   Granting Lewis Protection Under the Fifth Amendment

Petitioner claims that the trial court violated his right to compulsory process by granting Lewis the right not to testify under the Fifth Amendment at the hearing on petitioner's motion for a new trial.  Lewis did not invoke her Fifth Amendment right to not testify, however.  At the hearing on the motion for a new trial, the judge informed Lewis that she had the right to invoke the Fifth Amendment (Ex. B at 1755-57).  However, Lewis never invoked her Fifth Amendment rights and answered all questions posed to her, during which she indicated that she would not testify against her sister, petitioner's co-defendant, and that was hostile toward petitioner (*id.* at 1758-62).  Because Lewis answered all questions posed to her and did not invoke her Fifth Amendment rights, the petitioner's right to compulsory process was not violated and there is no basis for habeas relief on this claim.

### 4.   Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective in failing to move the trial court to compel the appearance or testimony of Lewis.  His lawyer did not seek this relief because she believed that she could do so, and that Lewis's police interrogation would not be admitted in any

1    event.

2            In order to prevail on a Sixth Amendment claim of ineffective assistance of counsel,

3    petitioner must establish that counsel's performance was deficient, i.e., that it fell below an

4    "objective standard of reasonableness" under prevailing professional norms.  *Strickland v.*

5    *Washington*, 466 U.S. 668, 686-88 (1984).  He must also establish that he was prejudiced by

6    counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

7    unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A

8    reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Ibid.*

9            First, petitioner has not shown that the trial counsel's performance fell below an objective

10   standard of reasonableness.  Trial counsel made a determination that it was not worth pursuing

11   Lewis as a witness after it became clear to her that Lewis was a hostile witness.  As discussed

12   above, petitioner and his co-defendant, who was Lewis's sister, sought to blame each other from

13   the crimes.  Defense counsel characterized Lewis as "a less-than-cooperative" and "hostile"

14   witness whose testimony would not be helpful to petitioner (Ex. B at 1763).  This was a

15   reasonable determination by trial counsel.  In addition, as discussed above, Lewis's credibility as

16   a witness was compromised by her drug use.  As a result, counsel acted reasonably in deciding

17   not to pursue Lewis as a witness, and for the same reasons – Lewis's hostility towards petitioner

18   and credibility problems – petitioner was not prejudiced by counsel's decision.

19           Consequently, the state court's denial of this claim was neither contrary to nor an

20   unreasonable application of federal law.

21   *//*

22   *//*

23

24

25

26

27

28

1

**CONCLUSION**

2       The petition for a writ of habeas corpus is **DENIED**.

3       Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule

4   on whether a petitioner is entitled to a certificate of appealability in the same order in which the

5   petition is denied.   Petitioner has failed to make a substantial showing that his claims amounted

6   to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this

7   court's denial of his claim debatable or wrong.   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

8   Consequently, no certificate of appealability is warranted in this case.

9       The clerk shall enter judgment and close the file.

10      **IT IS SO ORDERED.**

11

12  Dated: September __27__, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13

14

15

16

17  G:\PRO-SE\WHA\HC.08\CRUMMER3158.RUL.wpd

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California